GREGORY HOSKINS and          )
CAMIE HOSKINS, as parents and   )
Next of Kin for their Minor Child, T.H., )
     Plaintiffs,                 )
                                )
v.                               )    Case No. 2:13-cv-15
                                )    Judge Sharp
CUMBERLAND COUNTY BOARD OF  )
EDUCATION, d/b/A SOUTH       )
CUMBERLAND ELEMENTARY     )
SCHOOL, and THE PHOENIX SCHOOL; )
                                )
AARONA VAN WINKLE, Individually and )
in her Official Capacity as Director of   )
Cumberland County Schools;         )
                                )
KEENA INMAN, Individually and in her )
Official Capacity as 504 Coordinator for )
the Cumberland County School District;  )
                                )
DARRELL THREET, Individually and in )
his Official Capacity as Principal of    )
South Cumberland Elementary School;   )
                                )
BECKY BROWN, Individually and in her )
Official Capacity as Principal of South  )
Cumberland Elementary School and as   )
504 Coordinator for South Cumberland  )
Elementary School;                 )
                                )
EDDIE NUNLEY, Individually and in his )
Official Capacity as Principal of The   )
Phoenix School;                   )
                                )
and JOHN TOLLETT, Individually and  )
in his Official Capacity as the School    )
Resource Officer assigned to The Phoenix )
School,                         )
     Defendants.              )

**MEMORANDUM**

Before the Court are Defendant John Tollett's Motion for Summary Judgment, Docket No. 23, and a Motion to Dismiss or for Summary Judgment Filed by all Defendants (Other Than John Tollett), Docket No. 29. The Court will treat the motion filed by Defendants other than John Tollett as a motion for summary judgment. For the reasons that follow, both motions will be granted, and all of Plaintiffs' federal claims against all Defendants will be dismissed with prejudice. The Court will decline to exercise supplemental jurisdiction over the remaining state-law claims and will dismiss those claims without prejudice.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

This case involves an incident in which T.H., an eight-year-old second grader enrolled in South Cumberland Elementary School, a public school in Tennessee's Cumberland County School System, was handcuffed by a police officer for forty-five minutes in a school principal's office. The issues raised in this action are whether this handcuffing incident violated T.H.'s constitutional rights and also whether prior to this incident, the school system had violated T.H.'s rights by failing to evaluate him for and create a special education plan for him. Plaintiffs are T.H.'s parents, Gregory and Camie Hoskins, and they bring claims as parents and next of kin for T.H. Plaintiffs assert claims against Officer John Tollett, School Resource Officer and a Certified Police Officer with the Crossville Police Department, the Cumberland County Board of Education (the "School Board"), and five school employees who are sued in their individual and official capacities. The Court will refer to the School Board and the school employees as the "School Defendants."

Turning first to the facts underlying the claims related to the child's alleged special-education needs, there are several laws that protect a child's right to a public education. Section

2

504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, requires institutions that receive federal funds to provide individuals with disabilities, to the greatest extent possible, with an opportunity to fully participate with their peers. The Americans with Disabilities Act ("ADA") provides: "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The Individuals with Disability Education Improvement Act ("IDEIA"), 20 U.S.C. § 1400 *et seq*., ensures free and appropriate education services for children with disabilities who fall within one of the specific disability categories defined by the law.

The School board receives federal funds and is subject to these statutes. Information concerning IDEIA and Section 504 Plans was on the Cumberland County website throughout the time that T.H. was in the Cumberland County school system. That information is also described in student handbooks provided at each school to students and parents as part of the annual enrollment package of paperwork. The Cumberland County School Board has a Section 504 team.

T.H. started kindergarten in the fall of 2008, but his parents had so much difficulty getting the child to go to his classroom that they withdrew T.H. from school before the school year was over, concluding that perhaps he was not ready for kindergarten. T.H.'s father was regularly "dragg[ing] him physically down the hall" and sitting in the classroom or the hallway for an hour to an hour and a half until the child "calmed down, to make sure that he was going to be able to stay at school." Docket No. 59-4, at 9 (Gregory Hoskins' deposition). T.H. was diagnosed with separation anxiety in February 2009.

From the fall of 2009 until spring of 2010, T.H. repeated kindergarten. The record does not contain evidence of problems with T.H.'s functioning during that school year or for the beginning of his first-grade year. But in November 2010, the fall of the child's first-grade year, T.H.'s primary care physician provided the School Board with a Healthcare Documentation Form, diagnosing T.H. with anxiety and recommending a temporary homebound program for him. On December 2, 2010, the child's mother, Camie Hoskins, signed for and received a Section 504 packet from the School Board that included detailed information related to Section 504. On December 3, 2010, Camie Hoskins and the School Board's Section 504 team members executed a Section 504 Homebound Student Services Agreement, approving a short-term, temporary Section 504 plan for the child to be on homebound status. That paperwork included a Homebound Receipt of Rights Booklet explaining parent and student rights under Section 504. Docket No. 32-1, at 15 (Camie Hoskins' deposition). Ms. Hoskins concedes that she signed the form acknowledging receipt of the booklet but says she did not "read [it] very well." *Id.* She testified in her deposition that she read it quickly, while standing up, with the understanding that she needed to sign the form to set up the homebound services. She says she did not receive a copy of the booklet to take with her. She and T.H.'s father both state that they had not heard the term "504" until after the handcuffing incident. They state that the available print and internet information about Section 504 plans was not helpful because the parents did not realize the information applied to their son or that he needed additional evaluation or services. *Id.* at 33. In February 2011, while on homebound status, the child was also diagnosed as having a mood disorder.

On March 30, 2011, a Section 504 team that included a behavioral specialist, psychologist, and others convened for a meeting to discuss T.H.'s needs. Although Camie

Hoskins had returned the invitation to the meeting with an indication that she would attend, she was not able to attend. The meeting was conducted without either of T.H.'s parents present, and the team created a transition plan for T.H.'s re-entry into the school setting. The School Defendants allege that in addition to missing this meeting, T.H.'s parents declined to have the child undergo additional evaluation and testing needed for further determination of Section 504 eligibility. But the child's father testified in deposition that the only further evaluation he understood he was turning down was for vision and hearing testing, which he did not believe the child needed. Docket No. 32-2, at 52–56). T.H.'s mother seemed to think she was declining to have him assessed for further homebound services, which the parents did not believe would continue to be necessary. Docket No. 32-1, at 22, 32. The parents testified that they did not understand that further evaluation to address T.H.'s anxiety and behavior issues was needed or available to address his issues. In fact, the parents did not understand that the homebound service arrangement was itself a Section 504 Plan. Plaintiffs do not dispute that T.H. had made good grades during the time of his temporary homebound assessment, was reading above grade level, had no identified learning difficulties, and had good social skills. T.H. began second grade in the fall of 2011 without homebound services or a Section 504 Plan.

There were occasions in second grade when T.H. would not part from his parents and enter into his classroom, and on those occasions school personnel who had been trained in procedures and practices using crisis-response techniques used those techniques to get the child to his classroom. On the occasions when a staff member placed hands on the child to get him to his classroom, he was taken afterward to a school nurse to ensure he had no injuries. On each occasion, the nurse noted that there were no marks, bruising, or reported pain by T.H. Docket Nos. 30-2, 30-3, 30-4, 32-3, 32-8. The special education teacher trained in crisis-response

techniques who was involved in a few instances in which T.H. was physically touched at the school gives examples in her affidavit of the kinds of touching that occurred, including an instance when the teacher put her hand on the child's side while escorting him from the hall to the classroom and another instance, after the child tried to flee, when she put her hand on his upper arm while escorting him to class. Docket No. 30-2. The nurse examined the child three times during his second-grade year. The first two times were in the middle of August 2011. The third time was February 23, 2012, about a week before the handcuffing incident. T.H.'s parents testified that they believe their child was "dragged" to class on numerous occasions, but they offer no evidence to rebut Defendants' evidence that the interventions taken to get T.H. to class were done without injury to him and in compliance with accepted crisis-response techniques.

Aside from the few occasions when school staff members had to assist T.H. with getting to his classroom, the parties present no evidence of other problems with T.H. during second grade until a few days before the handcuffing incident. On February 27, 2012, T.H. threatened to hit his teacher and then swung his fist in her vicinity, although he says he swung away from her, not intending to hit her. It is unclear what caused this outburst. Neither T.H. nor his parents dispute that the child swung his fist in the vicinity of the teacher. The school's response to this incident was to place the child in an alternative school, the Phoenix School, for three days. Plaintiffs represent, without pointing to any evidence in the record, that this school is for students in grades seven through twelve who have been suspended or expelled from their regular school program. Docket No. 55 at 4 (Plaintiffs' brief). Again without directing the Court to evidence to support such a claim, Plaintiffs also assert that they urged the school to impose a different consequence, like home suspension or in-school suspension, but the school system insisted on sending the child to the alternative school for three days. *Id.*

On March 1, 2012, a teacher at the Phoenix School was with T.H. in the gym. According to this teacher, when T.H. was not able to do as many repetitions of an exercise as the teacher requested, he became agitated, threatened that he and his older brother would "beat the crap" out of her, and then drew back his right fist and swung it in the vicinity of the teacher, but did not hit her. T.H.'s father testified that the child told him that he "swung away" from the teacher, trying to get the teacher to stop holding onto him, and did not intend to hit the teacher. The parties dispute the exact details of who escorted the child from the gym and whether Officer Tollett or the school principal encountered the child first, but this dispute is not material to the resolution of this matter. Defendants do not allege that the child was verbally or physically aggressive on the way to the principal's office, and he was not handcuffed on the way to the office. Defendants allege that the child drew back his fist and threatened to strike the principal and, separately, Officer Tollett, but did not swing his fist at either individual. Plaintiffs do not respond to this allegation, so the Court will treat it as undisputed. Docket No. 59, at 6–7 (Plaintiffs' Consolidated Response to Undisputed Facts). T.H. was 55.5 inches tall and weighed 112 pounds at the time of this incident, which Defendants characterize as being larger than a typical eight-year-old child.

Once in the principal's office, Officer Tollett placed the child in handcuffs. The officer testified that his intention was to arrest the child and take him to juvenile detention, but that once the officer realized that he knew the child's parents, he called and asked them to come to the school to talk about the situation.[1] The child remained in handcuffs for forty-five minutes during

[1] Plaintiffs attempt to dispute whether or when Officer Tollett realized he knew T.H.'s parents and whether he ever actually intended to arrest the child. Gregory Hoskins testified in his deposition that he believed that Officer Tollett would have immediately known T.H. was Gregory Hoskins' son upon entering the room. He did not believe that Officer Tollett intended to

this conversation, at the end of which Officer Tollett released the child to go home with his parents. According to T.H.'s parents, the handcuffs left indentations on the child's wrist, caused the wrists to be a "little sore," and caused him emotional trauma.

There is no affidavit or deposition testimony from T.H. in the record before the Court, only the depositions of his parents. The parents were not present during the incidents at the Phoenix School on March 1, 2012, before their arrival upon receiving a telephone call from Defendant Tollett. The parents do not dispute that T.H. drew back his fist or threatened to hit the teacher, principal, or police officer, though they say the child told them he did not intend to actually hit anyone.

After this incident, on March 5, 2012, T.H.'s parents applied for (and subsequently received) a special education plan for T.H. On March 6, 2012, T.H.'s parents filed a Complaint with the Office of Civil Rights (OCR) alleging that the Cumberland County Board of Education had discriminated against the child by failing to suspect he had a disability and evaluate him sooner for a special-education plan based on his behavior and anxiety issues. On August 31, 2012, the OCR and the School Board entered into a Resolution Agreement resolving the OCR complaint, under which the School Board agreed "to take all steps reasonably designed to ensure that students enrolled in the District are appropriately evaluated prior to making an eligibility determination under Section 504 and Title II and developing a 504 Plan for students." Docket No. 3207, at 16–19. The Resolution Agreement does not make specific findings about the School Board's handling of the situation with T.H.

---

take the child to juvenile detention because, in Gregory Hoskins' opinion, the child had not committed a chargeable offense.

On February 28, 2013, Plaintiffs filed this Complaint, acting as parents and next of kin for the minor child T.H. Plaintiffs assert that Defendant Tollett violated T.H.'s Fourth Amendment right to be free of unreasonable seizures. This claim is not raised against the School Defendants. Each of Plaintiffs' other claims are raised against Defendant Tollett and the School Defendants: substantive due process violation for handcuffing T.H. and for not recommending a 504 plan under the Rehabilitation Act or as required by the Americans with Disabilities Act; assault; battery; intentional infliction of emotional distress; and negligence. Plaintiffs seek compensatory damages for physical and emotional pain and suffering in an amount not to exceed $500,000, punitive damages in an amount not to exceed $500,000, pre- and post-judgment interest, statutory damages for negligence against Defendant School Board in an amount provided by the Tennessee Governmental Tort Liability Act, discretionary costs, attorney's fees, declaratory judgment, and injunctive relief.

On February 19, 2014, Defendant Tollett filed a motion for summary judgment. On April 30, 2014, the School Defendants filed a motion to dismiss or, in the alternative, for summary judgment. Both motions were accompanied by a memorandum of law and a statement of undisputed facts. On October 16, 2014, this Court entered an order noting that although the Plaintiffs had filed responsive briefs to the two pending motions, they had failed to respond to the Statements of Undisputed Material Facts filed in support of the motions, as required under Local Rule 56.01(c). At that point, Plaintiffs had not filed any evidence to support their claims in response to the pending motions for summary judgment. The Court instructed Plaintiffs to file a proper response to the Statement of Undisputed Material Facts in both pending motions, with proper citations to the record. Docket No. 58. In response to the Court's Order, Plaintiffs filed a response to Defendants' statements of facts that was not formatted in conformity with Local Rule

56.01(c). The School Defendants placed Plaintiffs' responses into a properly formatted document and then placed their own replies within the format, which the Court appreciates. Other than responding to the Defendants' statements of fact, the only evidence Plaintiffs have provided to the Court are documents related to their complaint to the Office of Civil Rights and the entire 348-page deposition of Gregory Hoskins. Docket Nos. 59-3, 59-4.

## ANALYSIS

### I.    Summary Judgment Standard

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed .R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242 at 252. An issue of

fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578

F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## II.    § 1983 Unreasonable Seizure Claim Against Defendant Tollett[2]

Plaintiffs bring this 42 U.S.C. §1983 claim against Defendant Tollett, alleging that he

violated T.H.'s Fourth Amendment right to be free of unreasonable seizure when he handcuffed

T.H. for forty-five minutes. Defendant Tollett has moved for summary judgment on this claim,

arguing that he did not violate T.H.'s Fourth Amendment rights and, alternatively, if he did

violate T.H.'s constitutional rights, he is entitled to qualified immunity. The Supreme Court has

set forth a two-part inquiry for determining whether qualified immunity will operate as an

"immunity from suit" in a given case. "[T]he first inquiry must be whether a constitutional right

would have been violated on the facts alleged; second, assuming the violation is established, the

court must address whether the right was clearly established . . . on a . . . specific level" at the

time of the official's actions. *Saucier v. Katz*, 533 U.S. 194, 200 (2001).

### A.    Traditional Fourth Amendment Analysis

"To prevail on a § 1983 claim, a plaintiff must establish that a person acting under color

of state law deprived the plaintiff of a right secured by the Constitution or laws of the United

States." *Waters v. City of Morristown, Tenn.*, 242 F.3d 353, 358-59 (6th Cir. 2001). In this case,

---

[2] The School Defendants move for summary judgment on this claim, but Plaintiff only asserts this claim against Defendant Tollett. Docket No. 1, at 11. The School Defendants also state that it is unclear whether Plaintiffs assert a constitutional deprivation with regard to the child's occasional escort to class by school employees and so move for judgment on that claim as well. The Court does not interpret Plaintiffs' complaint as raising a claim based on the classroom escorts. Even if they intended to assert such a claim, Plaintiffs do not argue in their brief that the escorts constituted a constitutional violation, so the claim is abandoned. Moreover, there is no evidence that these escorts were in any way unlawful or unconstitutional, so even if it were not abandoned, the Court would find the claim to be without merit.

there is no dispute that Officer Tollett was a person acting under color of state law. The question here is whether he deprived T.H. of his Fourth Amendment rights.

The Fourth Amendment guarantees citizens the right "to be secure in their persons . . . against unreasonable . . . seizures." Determining the reasonableness of a seizure "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The Court's inquiry may also include whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*, and a consideration of "whether the totality of the circumstances justifies a particular sort of seizure." *Id.* "Because one of the factors is the extent of the intrusion, it is plain that reasonableness depends on not only when a seizure is made, but also how it is carried out." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985). The "reasonableness" inquiry prescribed by the Supreme Court "is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397 (citations omitted).

It is clear that the Fourth Amendment applies to seizures of schoolchildren by law enforcement officials in the school building. *Cf. New Jersey v. T.L.O.*, 469 U.S. 325, 340 (1985) ("To hold that the Fourth Amendment applies to searches conducted by school authorities is only to begin the inquiry into the standards governing such searches."); *see also Doe ex rel. Doe v. Haw. Dep't of Educ.*, 334 F.3d 906, 909 (9th Cir. 2003) (citing *T.L.O.* to support rejection of school official's argument that the Fourth Amendment does not apply to seizure of student by vice principal)). It is also clear that, for the purposes of the Fourth Amendment, T.H. was seized

by Defendant Tollett no later than when the officer placed handcuffs on the child and for the duration of the forty-five minutes that he remained in handcuffs. "We must think about seizures differently in the school context, as students are generally not at liberty to leave the school building when they wish. . . . To qualify as a seizure in the school context, the limitation on the student's freedom of movement must significantly exceed that inherent in every-day, compulsory attendance." *Couture v. Bd. of Educ. of Albuquerque Pub. Sch.*, 535 F.3d 1243, 1250–51 (10th Cir. 2008); *cf. Sandin v. Conner*, 515 U.S. 472, 485 (1995) ("[C]hildren sent to public school are lawfully confined to the classroom."). Under that standard, Officer Tollett's placing T.H. in handcuffs was a seizure under the Fourth Amendment.

Defendant Tollett argues that his handcuffing of T.H. was lawful because his intention was to arrest the child and take him to juvenile detention. He argues that Sixth Circuit precedent provides that "the handcuffing of a person in the course of an otherwise lawful arrest fails, as a matter of law, to state a claim for excessive force." *Neague v. Cynkar*, 258 F.3d 504, 508 (6th Cir. 2001). He further argues that the Sixth Circuit has held that "when there is no allegation of physical injury, the handcuffing of an individual incident to a lawful arrest is insufficient as a matter of law to state a claim of excessive force under the Fourth Amendment." *Id.* But Defendant Tollett misapprehends Plaintiffs' claim. T.H. had indentations on his wrist and some "soreness" where the handcuffs had been, so Plaintiffs could have raised an excessive force claim on his behalf, but did not. Instead, Plaintiffs' only Fourth Amendment claim is that Defendant Tollett unlawfully seized T.H. Unlawful seizure and excessive force are distinct claims. *See, e.g.*, *Humphrey v. Mabry,* 482 F.3d 840, 848–51 (6th Cir. 2007) (analyzing unlawful seizure and excessive force claims separately).

To properly analyze the factors enumerated in *Graham*—the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight— the Court must first consider the factors uniquely relevant to this case as required by *Graham*, namely the very young age of T.H. and the fact that this incident took place in a school setting. Defendant Tollett cites two Sixth Circuit cases that have approved the use of handcuffs on juveniles, although each of those cases involved teenagers and one of the cases involved a traffic stop. *See Gandy v. Panama City, Fla.*, 505 F.2d 630 (5th Cir. 1974) (fifteen-year-old handcuffed when being arrested for a traffic offense on a motorcycle); *Pigram v. Chaudoin*, 199 F. App'x. 509 (6th Cir. 2006) (high school student handcuffed after disruption in school). T.H., in contrast, was a much younger child, in his early elementary school years, and his handcuffing took place in a school building. As numerous court decisions demonstrate, although detentions of children "have not been held to be unreasonable per se," they do "raise additional concerns" *Gordon v. Louisville/Jefferson Cnty. Metro Gov't*, 486 F. App'x 534, 542 (6th Cir. 2012) (quoting *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)); *see also Tekle v. United States*, 511 F.3d 839, 847–48 (9th Cir. 2006) (officers not entitled to qualified immunity on excessive-force claim based on their detaining unarmed and barefoot eleven-year-old boy in handcuffs for fifteen to twenty minutes during arrest of his father when child was not resisting officers, was lying face down on ground with arms stretched in front of him, and had already been searched and found to have no weapons); *Ikerd v. Blair*, 101 F.3d 430, 435 (5th Cir. 1996) (sheriff not entitled to summary judgment on excessive-force claim for grabbing ten-year-old child's arm while arresting child's father, allegedly causing injuries to child's arm, when the child "was not under arrest and posed no threat to anyone"); *Baker v. Monroe Twp.*, 50 F.3d 1186, 1193 (3rd Cir.

1995) (law enforcement officials violated Fourth Amendment when they handcuffed and had guns out during twenty-five minute detention of seventeen and fifteen-year-old children); *McDonald by McDonald v. Haskins*, 966 F.2d 292, 295 (7th Cir. 1992) (officer not entitled to qualified immunity for excessive force claim for holding gun to head of nine-year-old boy and threatening to pull trigger during search of boy's residence when boy was not a suspect or attempting to evade officers or posing any other threat).

The first *Graham* factor—the severity of the crime at issue—weighs in favor of T.H. Because T.H. did not physically touch anyone, the crime at issue was a category of assault that is a Class B misdemeanor under Tennessee law, a relatively minor offense. *See* Tenn. Code Ann. § 39-13-101(a)(2) ("A person commits assault who . . . intentionally or knowingly causes another to reasonably fear imminent bodily injury.") Even in our society where the criminalization of children is lamentably becoming increasingly common, it remains relatively uncommon for law enforcement officers to arrest a child as young as T.H. at all, much less for this type of conduct. That is to say, not only was T.H.'s conduct not a "severe" crime, but also, given his extremely young age, arguably should not be treated as a crime at all. Although the Court has been unable to identify any limitation on the age of child that can be detained and arrested under Tennessee law, simple common sense dictates that it is not reasonable or appropriate to bring criminal charges against young children for relatively minor school misbehavior.[3]

---

[3]In a recent, unpublished opinion the Tenth Circuit found police officers had not used excessive force when they arrested a nine-year-old child for stealing an iPad from his school and for resisting arrest, even though they had used a "twist-lock" hold, pushed him against a wall, and handcuffed him. *Hawker v. Sandy City Corp.*, No. 13-4139, 2014 WL 6844928 (10th Cir. Dec. 5, 2014). In a separately published concurrence to this opinion, Judge Lucero agreed that the state of the law required the result reached by the majority, but opined as follows:

> The criminal punishment of young school children leaves permanent scars and unresolved anger, and its far-reaching impact on the abilities of these children to lead future prosperous and productive lives should be a matter of grave concern

As to the second *Graham* factor, it is unclear whether T.H. posed an immediate threat to the safety of the officer or others, because the parties provide no evidence about the timing of Officer Tollett's placing the child in handcuffs. It is unclear whether Officer Tollett handcuffed the child immediately after the child was making threats and pulling his fist back or whether there was some passage of time during which the child had calmed down and was more compliant. Either way, it is noteworthy that the child had not swung his fist at either adult. Based on the record before the Court, the Court cannot conclude that T.H. presented a threat at the time he was handcuffed. As to the third *Graham* factor, there is no evidence before the Court that the child was attempting to flee from the officer or other school staff members.

In light of the very young age of T.H., the nature of the conduct T.H. had engaged in, the school setting, and the fact that T.H. did not swing his fist at either the officer or the principal, the Court concludes that Defendant Tollett's initial handcuffing of T.H. was not objectively reasonable, and his leaving the child handcuffed for forty-five minutes was even less reasonable. Defendant Tollett violated T.H.'s Fourth Amendment rights.

**B.** *T.L.O.* **Analysis**

Having analyzed this claim under traditional Fourth Amendment doctrine, the Court notes that several circuits have analyzed similar claims under the standard the Supreme Court articulated in *New Jersey v. T.L.O.*, 469 U.S. 325 (1985), as governing searches of children in a school setting. Although the Fourth Amendment clearly applies in the school environment, the

---

for us all. Focusing narrowly on the legal standards applicable in this case renders it too easy to overlook the obvious question: Why are we arresting nine-year-old schoolchildren?
*Hawker v. Sandy City Corp.*, No. 13-4139, 2014 WL 6844930 at *1 (10th Cir. Dec. 5, 2014) (Lucero, J., concurring).

Supreme Court held in *T.L.O.* that "[i]t is evident that the school setting requires some easing of the restrictions to which searches by public authorities are ordinarily subject." *Id.* at 340. For example, "school officials need not obtain a warrant before searching a student who is under their authority." *Id.* After determining that the "privacy interests of school children" must be balanced against the "substantial need of teachers and administrators for freedom to maintain order in the schools," the Court held that, in the school setting, a search by teachers or school officials also need not be supported by probable cause, but instead need only "depend simply on the reasonableness, under all the circumstances, of the search." *Id.* at 341. The court continued:

> Determining the reasonableness of any search involves a twofold inquiry: first, one must consider whether the . . . action was justified at its inception; second, one must determine whether the search as actually conducted was reasonably related in scope to the circumstances which justified the interference in the first place. Under ordinary circumstances, a search of a student by a teacher or other school official will be justified at its inception when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school. Such a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction.

*Id.* at 341–42 (internal quotation marks, citations, and footnotes omitted).

Several courts of appeals have extended *T.L.O.* from searches to seizures of students by school officials, holding both that seizures of students are indeed governed by the Fourth Amendment, and also applying the more lenient *T.L.O.* standard of reasonableness under all the circumstances to students' challenges to school officials' seizures. *See, e.g.*, *Doe ex rel. Doe v. Haw. Dep't of Educ.*, 334 F.3d 906, 909 (9th Cir. 2003) (rejecting school official's argument that the Fourth Amendment does not apply to seizure of student by vice principal and holding that, "[i]n applying the Fourth Amendment in the school context, the reasonableness of the seizure must be considered in light of the educational objectives [the school official] was trying to

achieve"); *Wallace ex rel. Wallace v. Batavia Sch. Dist. 101*, 68 F.3d 1010, 1014 (7th Cir. 1995) ("We thus hold that, in the context of a public school, a teacher or administrator who seizes a student does so in violation of the Fourth Amendment only when the restriction of liberty is unreasonable under the circumstances then existing and apparent."); *Hassan ex rel. Hassan v. Lubbock Indep. Sch. Dist.*, 55 F.3d 1075, 1079–80 (5th Cir. 1995) ("Thus, while school officials are subject to the limitations of the fourth amendment, the reasonableness of seizures must be determined in light of all of the circumstances, with particular attention being paid to whether the seizure was justified at its inception and reasonable in scope."); *Edwards ex rel. Edwards v. Rees*, 883 F.2d 882, 884–85 (10th Cir.1989) ("We believe that the same considerations which moved the Supreme Court to apply a relaxed Fourth Amendment standard in cases involving school searches support applying the same standard in school seizure cases."). *But see Hawker v. Sandy City Corp.*, No. 13-4139, 2014 WL 6844928, at *3 n.8 (10th Cir. Dec. 5, 2014) (applying *Graham* to claim that police officer had used excessive force against a nine-year-old child in school setting and stating, "We have uncovered no case law (and the parties cite to none) applying a different standard when the victim of the alleged excessive force is a minor."). The Court has not identified a Sixth Circuit case addressing the legal question of whether *T.L.O.*'s "relaxed reasonableness" standard should apply to seizures that occur in the school setting.

There is also a separate question of whether *T.L.O.*'s reasonableness standard applies to the conduct of *law enforcement* searches or seizures in school settings, as opposed to the conduct of school administrators that was at issue in *T.L.O. See, e.g.*, *C.B. v. City of Sonora*, 769 F.3d 1005, 1023 (9th Cir. 2014) (noting that the court had not yet decided whether *T.L.O.*'s reasonableness standard or traditional Fourth Amendment rules apply to law enforcement searches and seizures in school settings and applying *T.L.O.* without deciding whether it is the

correct standard); *Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1304 (11th Cir. 2006) (applying *T.L.O.* to an unlawful-seizure claim against a deputy at an elementary school); *Shade v. City of Farmington*, 309 F.3d 1054, 1060–61 (8th Cir. 2002) (applying *T.L.O.* to a challenge to a search conducted by law enforcement officers acting in conjunction with school officials). The Court has not identified a Sixth Circuit case addressing this legal issue either.

This Court is of the opinion that the better standard for analyzing T.H.'s claim is the traditional Fourth Amendment standard, rather than the relaxed standard articulated in *T.L.O.* for two reasons. First, whatever standard the Sixth Circuit may ultimately determine to be appropriate for analyzing seizures by *school officials*, wholly different concerns are raised when, as in this case, a *law enforcement officer* seizes a child at school. School officials constantly limit the liberty of schoolchildren. We have compulsory education in this country, requiring school-aged children to attend school, to be in the classroom where school officials tell them to be, to sit in the chair when and where school officials tell them to sit, to move about the school property from activity to activity when school officials tell them to do so. As the Seventh Circuit observed,

> The distinction between deprivations of liberty in school and in the law enforcement context highlights what, to begin with, amounts to an awkward fit between the Fourth Amendment and non-law enforcement action. With regard to school searches, or even school seizures of students' property, the fit is not so difficult because the goals of such searches and seizures are similar to the goals of law enforcement in searching and seizing private property: to detect aberrant behavior and to retrieve property.

> There is little parallel, however, between the school and law enforcement situations when there is a seizure of the person. The basic purpose for the deprivation of a student's personal liberty by a teacher is education, while the basic purpose for the deprivation of liberty of a criminal suspect by a police officer is investigation or apprehension. The application of the Fourth Amendment is necessarily different in these situations.

*Wallace*, 68 F.3d at 1014. In other words, when a law enforcement official seizes a child at school, it is more likely that the seizure is a law-enforcement action, not an action for the purposes of educating a child. That is particularly true under the facts of this case, in which the law enforcement officer used law-enforcement tools—handcuffs—for the stated purpose of arresting a child and taking him to detention.

Second, the difference between the traditional Fourth Amendment standard and the *T.L.O.* reasonableness standard is clear in the context of a search of a child. Under *T.L.O.*, there need not be a warrant or even probable cause to search a school child. That is a clear deviation from the traditional requirements of the Fourth Amendment for searches that do not involve schoolchildren during the school day. But the difference between the traditional Fourth Amendment standard and the *T.L.O.* reasonableness standard as applied to seizures is less clear. *Graham* outlines factors for the Court to consider in determining whether a seizure was objectively reasonable, and invites courts to consider any other factors relevant to the facts of a particular case. The *T.L.O.* reasonableness standard would require a court to consider whether the seizure is reasonable "under all the circumstances," including whether "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *T.L.O.*, 469 U.S. at 341–42. The Court finds these standards to be quite similar in their application to a seizure of a child at school.

Although the traditional Fourth Amendment analysis appears best suited to the facts of this case, the Court will nonetheless conduct an analysis under the *T.L.O.* standard, as circuits other than the Sixth Circuit have done, in the event that the Sixth Circuit determines in an appeal of this matter that *T.L.O.* is the correct standard. Using the two-part reasonableness inquiry set

forth in *T.L.O.*, the Court finds, based on reasons articulated above, that even if the initial handcuffing of T.H. was justified, a question about which the Court has considerable doubt, the scope of the seizure—that is, the handcuffing of the child for forty-five minutes, even after his parents arrived at the school and were present in the room with him—was unreasonable. There is no evidence in the record whatsoever that indicates that the extended period of time during which T.H. remained in handcuffs was justified. There is no evidence that T.H. continued to be verbally aggressive or defiant or that he gave any indication that he would flee. Furthermore, *T.L.O.* specifically requires that the search (or seizure, in this instance) not be "excessively intrusive in light of the age and sex of the student and the nature of the infraction." *T.L.O.*, 469 U.S. at 342. Again, T.H. was age eight when this incident occurred, and in the second grade. He was a startlingly young child to be handcuffed at all, much less for forty-five minutes, with the stated intention of being taken to juvenile detention and prosecuted for misdemeanor assault. In the context of the age of this child and his alleged infraction, the Court finds that Officer Tollett's extended handcuffing of T.H. was unreasonable.

### C.      Qualified Immunity

Having found that Officer Tollett violated T.H.'s Fourth Amendment right to be free of unreasonable seizure, the Court turns to whether the right was clearly established on a specific level at the time of the officer's actions *Saucier v. Katz*, 533 U.S. 194, 200 (2001). "The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. . . . 'The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Although neither the Court nor the parties has identified a Sixth Circuit case directly on point, at least two courts of appeal have held that law enforcement officers were not entitled to qualified immunity for handcuffing children. In *C.B. v. City of Sonora*, the Ninth Circuit applied *T.L.O.* to a claim that police officers violated an eleven-year-old schoolchild's Fourth Amendment rights when they handcuffed him on his school playground, placed him in the back of the patrol car, and drove him to a family member. 769 F.3d 1005, 1027 (9th Cir. 2014). [4] The court noted that, at the time the officers arrived, the child was calm, complaint, nonresponsive, and provided no indication that he might flee, notwithstanding a teacher's statement that he was a "runner." *Id.* at 1024–25. Applying the two-step *T.L.O.* reasonableness standard, the court concluded that the officers acted reasonably at the outset by attempting to engage with the child, but that their decision to seize the child and remove him from school grounds was not reasonable. *Id.* at 1024. Finding that the violation was clearly established, the court held:

---

[4] The Ninth Circuit noted that it had not yet decided whether *T.L.O.* applied to law enforcement officers, but applied it nonetheless because other circuits had done so:

> *T.L.O.* is distinguishable from this case in a critical respect: *T.L.O.* involved the conduct of school administrators, not law enforcement officers. 469 U.S. at 328. We have not yet decided whether *T.L.O.*'s reasonableness standard or, instead, traditional Fourth Amendment rules apply to law enforcement searches and seizures in school settings, and there is no need to do so today. At the time of the incident, at least two of our sister circuits had held that *T.L.O.*'s reasonableness standard governs law enforcement conduct concerning school-related incidents in school settings. See *Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1304 (11th Cir. 2006) (applying *T.L.O.* in analyzing an unlawful seizure claim against deputy at an elementary school); *Shade v. City of Farmington*, 309 F.3d 1054, 1060–61 (8th Cir. 2002) (applying *T.L.O.* to evaluate the legality of a search conducted by law enforcement officers in conjunction with school officials). Consequently, at the time of this incident, an officer could have reasonably believed that *T.L.O.* governed law enforcement searches and seizures on school grounds for school-related purposes.

*C.B.*, 769 F.3d at 1023–24

At the time of C.B.'s seizure, the law was clearly established that, at a minimum, police seizures at the behest of school officials had to be reasonable in light of the circumstances and not excessively intrusive. *See, e.g., T.L.O.*, 469 U.S. at 341–42; *Doe* [*ex rel. Doe v. Haw. Dep't of Educ.*, 334 F.3d 906, 909 (9th Cir. 2003)]; *Gray* [*ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1304 (11th Cir. 2006)]; *Jones* [*v. Hunt*, 410 F.3d 1221, 1228 (10th Cir. 2005)]; *Shade* [*v. City of Farmington*, 309 F.3d 1054, 1060–61 (8th Cir. 2002)]. Although the application of this constitutional principle may not be clear in certain circumstances, this "general constitutional rule ... may [still] apply with obvious clarity to the specific conduct in question, even though "the very action in question has [not] previously been held unlawful." *United States v. Lanier*, 520 U.S. 259, 271 (1997).

*Id.* at 1026-27 (some citations omitted).

In *Bostic*, the Eleventh Circuit applied *T.L.O.*'s reasonable standard and concluded that an officer acting as school resource officer was not entitled to qualified immunity for handcuffing a nine-year-old, fourth-grade child who physically threatened her gym teacher but was sitting quietly and compliantly at time officer handcuffed her. 458 F.3d at 1307. The officer handcuffed the child for five minutes in the hallway, with the handcuffs tightened such that they caused her pain, for the purpose of demonstrating to her "how it feels to be in jail." *Id.* at 1301. Two coaches involved in the incident stated that they were not afraid the child would ever actually physical hurt them and that the event "wasn't that major." *Id.* The *Bostic* court noted that by the time the officer handcuffed the child, the incident was over, the child was cooperating with the coach's request to stand by the wall, and there was no indication that the child "was gesturing or engaging in any further disruptive behavior." *Id.* The officer did not claim that he handcuffed the child to protect his or anyone's safety or that he intended to arrest her. Based on these facts, the Eleventh Circuit concluded that the officer had violated the child's Fourth Amendment rights and that he was not entitled to qualified immunity because, even though there was no case on point addressing "when it may be reasonable to use handcuffs in an investigatory stop absent a safety rationale," the officer's conduct was obviously unconstitutional. *Id.*; *see also*

*J.W. ex rel. Williams v. Roper,* 541 F.App'x 937, 943 (11th Cir. 2013) (citing *Bostic* and holding school resource officer not entitled to qualified immunity after using chemical spray on a high school student a second time, "when she was incapacitated, non-resistant, and writhing in pain on the ground."); *Moretta v. Abbott*, 280 F.App'x 823 (11th Cir. 2008) (holding police officers not entitled to qualified immunity because constitutional violation was obvious when officers shot six-year-old child in school office with a Taser gun causing the child to convulse violently and vomit, which caused "severe, significant and permanent injury to [the child], including extreme mental and physical suffering and loss of bodily function").

The record in this case does not demonstrate whether the principal and the officer actually continued to be afraid for their safety at the time the handcuffs were placed on T.H., how much time elapsed between T.H.'s threats and rearing back of his fist and the officer's putting him in handcuffs, what T.H.'s demeanor was at the time the handcuffs were put on, or what his demeanor was for any of the forty-five minutes that he sat with handcuffs on in the principal's office. "Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity." *Silverstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006) (citing *Barrett v. Steubenville City Schools*, 388 F.3d 967, 970 (6th Cir. 2004)); *Austin v. Redford*, 690 F.3d 490, 496 (6th Cir. 2012)). Based on the record before the Court, Plaintiffs have not demonstrated that Officer Tollett is not entitled to qualified immunity. Accordingly, Officer Tollett's motion for summary judgment on Plaintiff's claim of unlawful seizure will be granted on the basis of qualified immunity.[5]

---

[5] Defendant Tollett moves to dismiss any claim raised by Camie and Gregory Hoskins based on their own injuries as parents of T.H. The Court does not interpret Plaintiffs' Complaint as raising claims or seeking damages for the parents' own injuries, but the Court agrees that if, and to the extent that, Camie and Gregory Hoskins assert claims on their own behalf, as opposed to on behalf of their minor child, those claims must be dismissed for failure to state a claim upon

**III.    Substantive Due Process Claim Against Defendants for Violation of Section 504 of the Rehabilitation Act, the ADA, and the IDEIA**

Plaintiffs assert a claim under 42 U.S.C. § 1983 alleging that the Defendants violated T.H.'s substantive due process rights by handcuffing him and by failing to recommend a Section 504 Plan or other rights he had under the ADA. It is difficult to discern from Plaintiffs' Complaint which claim is asserted against which defendant. Plaintiffs allege that "Defendants" did not recommend a Section 504 Plan or other plan to protect his rights under the ADA. As part of this claim, Plaintiffs also allege that the handcuffing caused the child physical and mental injuries, that the punishment by handcuffing was disproportionate to T.H.'s actions, that the handcuffing was done with malice and intent to punish and scare the child, and that the handcuffing amounted to an inhumane abuse of official power. Plaintiffs conclude this claim with the assertion that "the Defendants, other than Defendant Tollett, are liable under this cause of action due to the doctrine of *respondeat superior*." Docket No. 1 at 12.

The Court interprets this claim as having two components—one related to the handcuffing incident and one related to the child's rights under the ADA and Section 504. As for the handcuffing incident, the Court interprets this count as alleging that Defendant Tollett is responsible for violating T.H.'s substantive due process rights by handcuffing him, and that the School Defendants are liable for the handcuffing under the doctrine of *respondeat superior*. To the extent that Plaintiff intends to raise the handcuffing issue as both a Fourth Amendment claim and also a substantive due process claim, the Court declines to differentiate between the two in that manner. In the "unlawful seizure context" raised here, "there is no need to differentiate

---

which relief can be granted.  *See, e.g.*, *Claybrook v. Burchwell*, 199 F.3d 350, 357 (6th Cir. 2000) (holding that no cause of action may lie under Section 1983 for emotional distress, loss of a loved one, or any other collateral injuries allegedly suffered by an injured individual's family members).

between a so-called Fourth Amendment theory and a substantive due process theory because they are coextensive. Whether viewed through a Fourth Amendment lens or a substantive due process lens, the substantive right protected is the same." *Albright v. Oliver*, 510 U.S. 266, 309-10 (1994). The Court has analyzed the handcuffing claim under both the *T.L.O.* reasonableness standard and the traditional Fourth Amendment standard; under either standard, the claim fails. To the extent that Plaintiffs intended to assert a claim related to the handcuffing issue incident against the School Defendants under a theory of *respondeat superior*, that claim fails as well, both because the Court has already concluded that Defendant Tollett did not violate T.H.'s rights, and also because "[r]espondeat superior is not a proper basis for liability under § 1983." *McQueen v. Beecher Cmty Schs.*, 433 F.3d 460, 470 (6th Cir. 2006).

As for the ADA and Section 504 component, the Court interprets this claim as being raised against only the School Defendants. The wording of the Complaint is ambiguous, but it does not appear from the Complaint or Plaintiffs' briefs that they intend to assert this claim against Defendant Tollett.  If they did intend to assert this claim, they have abandoned it. Furthermore, it does not appear to be even arguable that Defendant Tollett, a police officer, had any responsibility for identifying or creating an individualized plan for T.H. under Section 504, the ADA or the IDEIA.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act likewise provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be

subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

"Apart from [Section 504's] limitation to denials of benefits 'solely' by reason of disability and its reach to only federally funded—as opposed to 'public'—entities, the reach and requirements of both statutes are precisely the same." *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 452–53 (6th Cir. 2008) (quoting *Weixel v. Bd. of Educ. of N.Y.*, 287 F.3d 138, 146 n.6 (2d Cir. 2002)). Defendants concede that they receive federal funding, and Plaintiff does not appear to argue that he was denied benefits for any reason other than his alleged disability. Thus, as neither of these differences between the ADA and Section 504 is at issue in this case, the Court will analyze the claims together. *Id.*; *Thompson v. Williamson Cnty*, 219 F.3d 555, 557 n.3 (6th Cir. 2000) (analyzing ADA and Section 504 claims together because the statutes provide the same remedies, procedures, and rights); *Maddox v. Univ. of Tenn.*, 62 F.3d 843, 846 n.2 (6th Cir. 1995) (concluding that because the protections under the ADA and Rehabilitation Act are parallel, the court's reasoning with respect to a claim raised under one statute "applied with equal force" to a claim raised under the other statute).

To establish a *prima facie* violation of Section 504 or the ADA, a plaintiff must show that he or she is: (1) disabled under the statute; (2) "otherwise qualified" for participation in the program; and (3) being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely by reason of her handicap. *S.S.*, 532 F.3d .at 453. The Rehabilitation Act contains an additional requirement that the relevant program or activity receives federal financial assistance. *Id.* at 452. As to the third element, the Sixth Circuit has explained, "the Rehabilitation Act *further requires* that the [plaintiff] must ultimately prove that the defendant's failure to provide [the plaintiff] with a free appropriate public education was

*discriminatory*. Surmounting that evidentiary hurdle requires that 'either bad faith or gross misjudgment must be shown before a § 504 violation can be made out, at least in the context of education of handicapped children.'" *Campbell v. Bd. of Educ. of Centerline Sch. Dist*., 58 F.App'x 162, 167 (6th Cir. 2003) (quoting *Monahan v. Nebraska.*, 687 F.2d 1164, 1171 (8th Cir. 1982) (emphasis in original).

Under Section 504, a handicapped person is any person who (1) has a physical or mental impairment which substantially limits one or more major life activities, (2) has a record of such an impairment, or (3) is regarded as having such an impairment. 34 C.F.R. § 104.3(j). The ADA defines disability as having "a physical or mental impairment that substantially limits one or more of the major life activities." 42 U.S.C. § 12102(2)(A). "Substantially limited" is the inability "to perform a major life activity that the average person in the general population can perform." 29 C.F.R. § 130.2(j). "Major life activities" include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

Plaintiffs have not established a *prima facie* violation of either Section 504 or the ADA. First, they have not presented to this Court proof that T.H. is handicapped or disabled within the meaning of the Acts. They have not identified the nature of the purported disability or shown that it substantially limits any major life activity. Nor is there any proof that T.H.'s parents perceived him to be disabled. They have not shown that the School Board acted in bad faith or exercised gross misjudgment by not conducting additional testing and evaluation for purposes of determining Section 504 eligibility. The parents admit that after a period of homebound instruction, itself an accommodation, the child was ready to return to school. From the time the child returned to school as a second grader, the evidence before this Court only demonstrates a

few instances in which the school had to help escort the child to his classroom. It is not uncommon for children as young as T.H. to occasionally have difficulty separating from parents upon arrival at school.[6] It is also undisputed that T.H.'s grades were high and that he did not appear to have trouble learning.

Moreover, although neither party addressed the issue, Plaintiffs' claims under Section 504 and the ADA also fail because Plaintiffs failed to exhaust the administrative procedures set forth and required by the IDEIA. When a claim under Section 504 or the ADA involves public education, the Court must consider the IDEIA's exhaustion requirements. *S.E. v. Grant Cnty. Bd. of Educ.,* 544 F.3d 633, 642 (6th Cir. 2008). Section 1415 of the IDEIA contains "a detailed provision setting forth procedures to be established by state educational agencies that receive federal assistance, 'to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies.'" *Id.* (quoting 20 U.S.C. § 1415(a)). The IDEIA further provides that claims brought under other statutes, such as the Rehabilitation Act, seeking "relief that is also available" under the IDEIA, also must have complied with the IDEIA's exhaustion requirement. *Id.* (quoting 20 U.S.C. § 1415(l)); *see also Robb v. Bethel Sch. Dist. # 403,* 308 F.3d 1047, 1048 (9th Cir. 2002) ("[W]hen a plaintiff has alleged injuries that could be redressed to any degree by the IDEA's administrative procedures and remedies, exhaustion of those remedies is required.").

---

[6] Defendants argue that they are not liable for any alleged violation of T.H's rights under Section 504 or the ADA because in March 2011, T.H.'s parents would not allow the school to conduct the tests necessary to evaluate whether he needed services. But that fact is disputed, as the parents' deposition testimony indicates that they did not understand that the purpose of the School Defendants' offering or suggesting further evaluation was to identify any handicap or disability.

As the Sixth Circuit explained in *S.E.*, the remediation of educational issues is "initially best addressed by educational professionals through the administrative process." *S.E.*, 544 F.2d at 642–43. As an additional benefit, "the administrative review procedures available" would provide a factual record for the Court to consider, including whether the actions T.H. complains of "improperly excluded [him] from or denied [him] the benefits of the education to which [he] was entitled, or subjected [him] to improper discrimination on account of [his] disability." *Id.* at 643. These are some of the very issues that have not been addressed in the record before this Court. There are exceptions to the exhaustion requirement, such as situations in which it would be futile or inadequate to protect the plaintiff's rights, or when plaintiffs were not given full notice of their procedural rights under the IDEIA, but "the burden of demonstrating futility or inadequacy rests on the party seeking to bypass the administrative procedures." *Id.* at 917 (citation omitted). There is no evidence that Plaintiffs exhausted administrative remedies or that they fall within any of the exceptions to the exhaustion requirement.

Plaintiffs' complaint does not mention the IDEIA, but in their brief in response to the School Defendants' motion for summary judgment, they appear to argue that the School Defendants violated the IDEIA. Docket No. 55, at 7–10, 12 ("The Defendants attempt to improperly shift the burden for substantive compliance with the IDEIA from Cumberland County Board of Education to T.H.'s parents."). To the extent Plaintiffs assert a claim under the IDEIA, it must be dismissed because of the failure to exhaust administrative remedies as well.

For the foregoing reasons, the Court will enter judgment in favor of all Defendants on Plaintiffs' claims under Section 504, the ADA, and the IDEIA, to the extent Plaintiff asserts such claims.[7]

## IV.     State Law Claims

In addition to the federal claims, the Plaintiffs assert state-law causes of action. The basis for jurisdiction over these claims is supplemental, and therefore is premised on the existence of a viable federal claim. *See* 28 U.S.C. § 1367. As Plaintiff's federal claims are will be dismissed, this Court will decline to exercise jurisdiction over the state-law claims. 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim under [this] section if . . . the district court has dismissed all claims over which it has original jurisdiction."); *Musson Theatrical v. Fed. Express Corp.*, 89 F.3d 1244, 1254–55 (6th Cir. 1996) ("When all federal claims are dismissed before trial, the balance of considerations will usually point to dismissing the state law claims . . . ."). Plaintiffs' state law claims will be dismissed without prejudice.

## CONCLUSION

---

[7] Having found no violation of Section 504, the ADA, or the IDEIA, the Court will dismiss all claims against all Defendants based on these statutes. If that were not the case, the claims raised under each of these statutes against the School Defendants who are natural persons in their individual capacities would nonetheless be dismissed for failure to state a claim upon which relief can be granted because there is no individual liability under either any of these statutes. *See, e.g., Hiler v. Brown*, 177 F.3d 542 (6th Cir. 1999) (holding that the Rehabilitation Act does not impose individual liability); *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 808 n.1 (6th Cir. 1999) (holding that the ADA does not impose individual liability); *Link ex rel. Link v. Metro. Gov't of Nashville & Davidson Cnty.*, No. 3:12-CV-0472, 2012 WL 4506028, at *7 (M.D. Tenn. Sept. 28, 2012) (finding no individual liability under the IDEA, the predecessor statute to the IDEIA, because requiring a school employee in her individual capacity to comply with the IDEA even if she were to retire, be fired, or change careers would have no purpose).

For the foregoing reasons, the Court will GRANT Defendant John Tollett's Motion for Summary Judgment, Docket No. 23, and GRANT the Motion for Summary Judgment Filed by all Defendants (Other Than John Tollett), Docket No. 29, and dismiss with prejudice all federal claims. The Court will decline to exercise supplemental jurisdiction over the remaining state-law claims and will dismiss those claims without prejudice.

An appropriate order shall issue.

_____
KEVIN H. SHARP
CHIEF UNITED STATES DISTRICT JUDGE